## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JEREMY EUGENE REISS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16-cv-3037 |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Jeremy Eugene Reiss appeals pro se from the denial of his application for Supplemental Security Income Disability Benefits (SSI) under Title XVI of the Social Security Act.  42 U.S.C. §§ 1381a, and 1382c. This appeal is brought pursuant to 42 U.S.C. § 405(g).  Reiss has filed a Motion for Summary Judgment (d/e 14), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 17).  This matter comes before the Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the decision of the Defendant Commissioner should be AFFIRMED.

Reiss was born on February 13, 1981. He attended special education classes in school. He quit school having completed the ninth grade. Reiss suffers from asthma; degenerative joint disease of the right knee, status post-surgery; backache; hypertension; headaches; a learning disorder; intermittent explosive disorder; depression; anxiety; and history of drug abuse. Reiss filed his application for SSI on February 29, 2012. Reiss alleged he was disabled since he last worked in October 2002. Certified Copy of Transcript of Proceedings before the Social Security Administration (d/e 11) (R.), at 13, 202-03, 359, 410.

On January 21, 2008, the Christian County Mental Health Association (Mental Health Association) diagnosed Reiss with depressive disorder, low IQ based, and a "character pathology of mixed traits." Reiss also had a history of being in a "detention center on sex charge." R. 111. The assessment assigned Reiss with a Global Assessment of Functioning (GAF) score of 49. A GAF score is the measure of a clinician's judgment as to the individual's overall level of functioning or the severity of the individual's symptoms. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Revision 2000) (DSM-IV-TR), at 32-34. A GAF score of 41 to 50 indicated either serious

symptoms or serious functional limitations.  <u>Id.</u>, at 34.  The American

Psychiatric Association no longer recommends the use of the GAF score.

American Psychiatric Association, <u>Diagnostic and Statistical Manual of</u>

<u>Mental Disorders (5th ed. 2013) (DSM-5)</u>, at 16.

The 2008 Mental Health Association assessment found no evidence

of affective disorder or thought disorder with no marked memory or

concentration problems.  The person who conducted the assessment was

not an acceptable medical source.  R. 111.  <u>See</u> 20 C.F.R. § 404.1527

(definition of acceptable medical source).[1]

On March 21, 2008, state agency physician Dr. Vittal Chapa, M.D.,

performed a consultative medical examination.  R. 413-16.  Reiss reported

that in 1998 he had knee surgery complicated by a post-surgery staph

infection.  Reiss reported chronic back pain, pain in his upper arms,

weakness in his upper extremities, and headaches.  Dr. Chapa's

examination was "essentially unremarkable."  Reiss had full strength,

normal reflexes, full range of motion, and normal neurological examination

results.  R. 416.

---

[1] The Social Security Administration amended the definition of acceptable medical source effective March 27, 2017.  The amendments apply prospectively to applications filed after the effective date, and so, do not apply in this case.  <u>Revisions to Rule Regarding the Evaluation of Medical Evidence</u>, 82 Fed. Reg. 5844-01, at 5844-45 (January 18, 2017).

On March 21, 2008, state agency psychologist Dr. Stephen Vincent, Ph.D., performed a mental status assessment on Reiss.  R. 410-12.  Dr. Vincent noted a history of learning disabilities and anger problems.  Dr. Vincent observed signs of Attention Deficit Hyperactivity Disorder (ADHD).  Reiss reported that he had been treated for ADHD in the past.  The mental status exam showed that Reiss was easily distracted.  Reiss' mood was irritable with easy frustration.  Dr. Vincent also noted a history of substance abuse.  Dr. Vincent assessed ADHD, conduct disorder per history, intermittent explosive disorder, and mood disorder (not otherwise specified) with Bipolar-like features.  R. 412.

On April 8, 2012 Reiss' aunt, Kathy Scribner, completed a Work History Report.  R. 255-62.  Scribner reported Reiss worked various jobs briefly from 1995 to 2008, usually less than a year.   His only extended work was from 2001 to 2004.  At that time, he worked as a prep cook in a pizza restaurant.  Scribner described the work as "got dough ready to make pizzas, cut vegetables for toppings on pizza, did dishes, swept, mopped, janitorial jobs, unload truck with supplies."  R. 257.  Scribner reported Reiss got "frustrated, anxious, angry then become overly emotional" with friends and family.  Scribner stated that Reiss could not read and follow directions.  Scribner stated that Reiss: "Must be told one thing at a time and still will not

do it completely." R. 268. Scribner reported that Reiss did not get along with authority figures. She also said that he did not handle stress or changes in routine well. Scribner stated that Reiss used a cane to walk because his right knee swelled. R. 269.

On April 8, 2012, Scribner also prepared a Function Report-Adult form. R. 263-70. Scribner completed the form in the first person as if she was Reiss. Scribner said Reiss lived with his mother. She said he spent most of his days watching television, looking at merchandise catalogs, and listening to music. R. 264. Scribner said he could take care of his personal hygiene and dressing. Scribner said Reiss had some problems with buttons and shaving due to fingers and hands swelling. Scribner said she had to remind Reiss to take his medications. R. 264-65.

On April 26, 2012, state agency psychologist Dr. Dolores Trello, Psy.D., performed a mental status examination of Reiss. R. 470-75. Reiss reported that he had ADHD and was treated as a child, but has not received medication for ADHD for twenty years. Reiss reported he was sexually abused by his uncle when he was ten or twelve years old. Reiss reported that he had anger problems. Reiss reported that he heard voices once after his father died. His father died on November 11, 2011. The

voices told him not to go to the Baptist Church.  Reiss had not heard voices since.  R. 472-73, 475.

Dr. Trello's mental status examination showed no evidence of hallucinations, delusions, psychosis, or thought disorder.  Reiss' immediate, recent, and remote memory was fair.  He had difficulty performing simple calculations and could not provide abstract meanings of simple proverbs.  Dr. Trello assessed Reiss with intermittent explosive disorder, ADHD, bereavement, and generalized anxiety disorder.  Dr. Trello assessed a GAF score of 50 with "serious impairment in vocational, interpersonal, and academic functioning."  R. 473-74.

On May 8, 2012, Dr. Chapa performed another consultative examination.  R. 478-80.  Reiss reported pain and weakness in his right knee, arthritis in his hands, pain and occasional numbness in his upper extremities, low back pain, COPD, chest pain due to COPD, and headaches.  Dr. Chapa's examination was "essentially unremarkable." Reiss' knees were stable and not swollen.  The rest of his examination was also normal.  R. 480.

On July 20, 2012, the United States Office of Inspector General Cooperative Disability Investigations Unit (CDI Unit) issued a report regarding Reiss.  R. 490-97.  Investigators began the investigations

because Reiss was suspected of malingering due to his behavior at one of his consultative examinations and no history of medical treatment for mental impairments.  R. 492.  Reiss had a criminal history of retail theft, criminal trespass to land, possession of drug paraphernalia, battery, and resisting a police officer.   R. 493.  Local law enforcement in Reiss' hometown of Pana, Illinois, told investigators that Reiss did not appear to have any mental or physical impairment during their encounters with Reiss.  R. 492.  Pana Police Officer Crystal Bland told investigators, "I have known him all my life.  His whole family is on disability.  They are a bunch of scammers. . . .  He is a scumbag.  He is just dumb. . . .  I have noticed recently I only see him in town with his mother."  R. 493 (ellipses in the original).

On July 30, 2012, state agency psychologist Dr. Michael Schneider, Ph.D., prepared a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment for Reiss.  R. 125-30.  Dr. Schneider opined that Reiss' mental condition caused mild restrictions on daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation.  R. 126.

Dr. Schneider further opined that Reiss was moderately limited in his ability to: understand and remember detailed instructions; carry out detailed instructions; complete a normal workweek and perform at a consistent pace; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and set realistic goals or make plans independently.  R. 128-29.

Dr. Schneider discounted Drs. Vincent and Trello's reports as inconsistent with the Mental Health Association's evaluation of Reiss.  Dr. Schneider stated that the Mental Health Association's evaluation indicated that Reiss' mental impairments were significantly less disabling.  Dr. Schneider also relied on the CDI Unit's report regarding Reiss.  R. 126-27. Dr. Schneider concluded, "The CE [Drs. Vincent and Trello] reports were part of clmt's efforts to obtain disability payments and the Christian County records were not, and in light of the CDI report are seen as more credible than the CE reports."  R. 127; see R. 129.

On August 13, 2012, Reiss saw Nurse Practitioner Jazzcelyn Loleng with complaints of back pain.  Loleng ordered x-rays of Reiss' thoracic spine.  R. 519.  The x-rays showed normal results.  R. 513.

On August 23, 2012, Reiss' aunt, Kay Blades, completed a Function Report-Adult-Third Party form. Blades stated that Reiss had learning problems and speech problems. She said he watched television and listened to music. She said he had to be told to brush his teeth. Blades said, "He can not concentrate and forgets, he forgets to do things, must be told a few times before he understands." R. 277. She said he did not understand spoken instructions. She said that when under stress, he got mad and anxious, and screamed and hit the walls. R. 278. Blades said Reiss was diagnosed with ADHD and learning disabilities as a child. She stated that from age 9 to 15 he received treatment and counseling at the Mental Health Association. She said he quit high school at age 22 and had not completed the tenth grade. She said he quit or was fired from every job, "He quit do (sic) to too much work expected for him to do, he was too slow, he fell asleep, or he was a no show/no call." R. 280. She said he had depression, anxiety, and uncontrolled anger. She said, "Jeremy can do one simple direction at a time, if given more he gets confused, quits and does not complete job." R. 280. She also said Reiss hears voices. R. 280.

On September 4, 2012, Reiss went to the Mental Health Association. Reiss saw Sue Paso, a licensed clinical professional counselor (LPCP) and

licensed practitioner of the healing arts (LPHA).  Reiss was assessed with generalized anxiety disorder and intermittent explosive disorder.  Reiss was assigned a GAF score of 57.  R. 504.  A GAF score of 51 to 60 indicated either moderate symptoms or moderate functional limitations.  DSM-IV-TR, at 34.  Reiss reported that he heard voices, but he said the voices were more like his conscience.  He said he dropped out of school in the ninth grade.  Reiss reported that he was receiving SSI, but was about to lose his benefits.  R. 505.  Reiss went regularly to counseling sessions at the Mental Health Association after September 2012.  R. 498-512; 565-658.

On October 2, 2012, Reiss saw Paso for a counselling session. Pantoja listed Reiss' diagnoses as anxiety disorder and mild mental retardation.  Paso gave Reiss a GAF score of 55.  Reiss told Paso he was released from juvenile detention with the Illinois Department of Corrections in 2001.  Reiss said he was put on parole at that time.  As part of the parole he had to work for three years.  Reiss told Paso he worked at Pizza Hut for the three years from 2001 to 2004.   R. 505-08.

On October 24, 2012 Reiss saw Paso at the Mental Health Association.  Paso assessed Reiss with an adjustment disorder and mild mental retardation.  Reiss was worried about the upcoming one-year anniversary of his father's death.  Reiss' mood was euthymic, but he had

some floating anxiety and apprehension about the anniversary of the death. Paso assigned Reiss with a GAF score of 60.  R. 508-09.

On November 5, 2012, Reiss saw Loleng for an office visit.  Reiss complained of back pain and problems with his asthma and COPD.   Reiss requested a new inhaler for his asthma.  Loleng's examination of Reiss showed normal results.  Loleng changed Reiss' inhaler medication. R. 513-15.

On November 7, 2012, Reiss' aunt, Kathy Scribner, completed another Function Report – Adult form.  R. 290-99.   Scribner again filled out the form in the first person as if she was Reiss.  Scribner stated, "I have untreated depression and anxiety, I have uncontrollable anger.  I have increased stuttering.  I am unable to follow simple directions and hit walls when frustrated."  Scribner also said Reiss heard voices:  his late dad, God, and the late rapper Tupac Shakur.   Scribner reported, "I distract easily, has flight of ideas and uncontrollable shakes.  I have severe learning and speech disabilities."  R. 292.  Scribner said that Reiss needed to be reminded to bathe and shave.  She said he did not go out alone because he heard voices.  R. 294-95.

Scribner said Reiss had problems following instructions, "I can follow one direction at a time for 2 or 3 minutes.  I get distracted and confused

easily. I get angry and anxious." R. 297. Scribner said Reiss got angry

when dealing with authority figures. She said Reiss did not handle stress

or changes in his routine. She said he got confused and anxious. R. 298.

On January 25, 2013, Paso and Gerald Pantoja, a mental health

professional (MHP), prepared a mental status examination form for Reiss.

R. 653-58. The mental status exam portion of the assessment indicated

persecutory delusions, but no other thought content impairments. The

mental status exam showed no hallucinations. R. 653. The mental status

exam showed some impairment of memory and mildly poor attention span.

Paso and Pantoja noted that Reiss had "somewhat poor judgment and

insight." R. 653. Paso and Pantoja assessed various areas of daily

activities. Paso and Pantoja assessed poor communication and problem

solving skills; but good relationships with his family; good social network

skills with friends, neighbors, coworkers and other peers; and good

compliance with behavioral norms including respecting others and

controlling dangerous, violent, aggressive, bizarre, and nuisance behaviors.

Based on the activity assessment, Paso and Pantoja found an estimated

GAF score of 45. R. 654. Paso and Pantoja assessed Reiss with a mild

functional impairment due to his mental conditions. R. 655. Paso and

Pantoja listed Reiss' mental diagnoses as adjustment disorder, psychotic

disorder, and mild mental retardation.  Paso and Pantoja stated that Reiss'
highest GAF in the past twelve months was 60.  R. 658.

On February 1, 2013, Paso and Pantoja performed a six-month
assessment of Reiss.  R. 638-52.   Paso and Pantoja stated that Reiss
would be seen every three months by a psychiatrist identified as Dr. Patil.
R. 642.  The records submitted to the ALJ do not contain any notes from a
Dr. Patil.  Paso and Pantoja listed Reiss' mental diagnoses as adjustment
disorder, psychotic disorder, and mild mental retardation.  Paso and
Pantoja stated that Reiss' highest GAF in the past twelve months was 60.
R. 640, 58.

On March 18, 2013, psychologist Dr. Donna Hudspeth, Psy.D.,
prepared a Psychiatric Review Technique and a Mental Residual
Functional Capacity Assessment for Reiss.  R. 143-47.  Dr. Hudspeth
opined that Reiss had moderate difficulties in maintaining social functioning
and concentration, persistence or pace.  R. 144.  Dr. Hudspeth further
opined that Reiss was moderately limited in his ability to: understand and
remember detailed instructions; carry out detailed instructions; maintain
attention and concentration for extended periods; work in coordination with
or in proximity to others without being distracted; accept instructions and
respond appropriately to criticism from supervisors; get along with

coworkers or peers without distracting them or exhibiting behavioral extremes; and set realistic goals or make plans independently.  R. 144-47. Dr. Hudspeth put great weight on Paso's October 24, 2012 assessment of Reiss at the Mental Health Association.  R. 145.  Dr. Hudspeth also put more weight on the records from the Mental Health Association rather than Dr. Trello's opinions.  Dr. Hudsepth also relied, in part, on the CDI Unit report regarding Reiss.  R. 145-46.

On July 30, 2013, Paso and Pantoja completed a Comprehensive Mental Health Assessment of Reiss at the Mental Health Association.  R. 609-37.  Pantoja and Paso assessed Reiss with major depressive disorder, single episode and generalized anxiety disorder, and assigned Reiss a GAF of 50.  R. 637.  Paso and Pantoja assessed Reiss with no or very mild functional impairments in the areas of leisure activities; complying with behavioral norms including controlling dangerous, violent, aggressive, bizarre, or nuisance behaviors, respects others, and satisfactorily completing probation or parole. R. 629.

On October 7, 2013, Reiss saw Dr. Madhumita Banga, M.D. for pain in his chest wall.  Reiss' range of motion in his right shoulder was slightly impaired due to the pain.  Dr. Banga's examination confirmed Reiss' wheezing and back and chest pain, but was otherwise normal.  Dr. Banga

noted that Reiss' asthma was well controlled on his current medications.

Dr. Banga prescribed Tramadol for pain.  Reiss reported that NSAIDS

caused asthma attacks.  R. 552-55.

On March 6, 2014, Reiss saw Dr. Banga for a follow-up visit.  Reiss

reported he fell on some ice and hurt his ribs and right finger.  Dr. Banga

changed Reiss' asthma medication from Symicort to Flovent because of

insurance coverage problems.  Dr. Banga continued Reiss' other

medications.

<u>THE ADMINISTRATIVE HEARING</u>

On April 14, 2014, the Administrative Law Judge (ALJ) conducted an

evidentiary hearing.  R. 57-106.  Reiss appeared in person with his

attorney.  Vocational Expert Dr. James Lanier, Ph.D. and Reiss' aunt,

Kathy Scribner, also appeared.  Reiss' attorney objected to the CDI Unit

report as hearsay.  Reiss' attorney stated that Crystal Bland was a

dispatcher for the Pana Police Department, not a police officer.  The ALJ

admitted the CDI Unit report over Reiss' objection.   R. 59.  Reiss does not

challenge this ruling on appeal.  The ALJ also did not refer to the CDI Unit

report in her decision.

Reiss testified first.  Reiss was single.  He lived in a single-family

residence with his mother and his two brothers.  Reiss did not drive.  Reiss

said his aunt brought him to the hearing.  Reiss said that he believed he completed the tenth grade.  He did not get a GED.  R. 62-63, 65.  Reiss testified that he went to special education classes all through school.  Reiss testified that he went back to high school to try to finish, but did not,

> I went back -- from being a thief, I was in juvenile DOC and then when I got out they put me in 10th grade and the second time 11th grade. I didn't finish high school because I was 22 years old.

R. 85.

Reiss said he could read, "a little bit. Not too good."  Reiss, however, also testified that he "used to read a lot of books, but I got out of it."  He said he used to read Stephen King novels.  He also said, "I read kids' books all the time, Goosebumps by R.L. Stine."  R. 83-84.  Reiss said he took two days to read a short book like Goosebumps, but long books took him over a year.  R. 90-91.

Reiss said he could write well enough to fill out a job application. Reiss said he was not good with money.  He had problems counting change.  R. 64.

Reiss testified that his job at Pizza Hut was the longest job he held. He was a prep cook.  Reiss said that he quit to find a better job, but "it didn't work out too good."  Reiss said he quit or was fired from the other jobs he had.  He said he missed work too much.  He said he would overeat

at lunch at work and go home sick.  R. 67.  He said his last job in 2008 was at a McDonald's restaurant.  He said he was fired from McDonald's because he was too slow.  R. 69.

Reiss testified that he went to mental health counseling and took medications for his mental problems.  He said that the medications helped with his symptoms.  He was not aware of any side effects.  Reiss said that he still got mad and frustrated easily.  He said he took his frustrations out on himself, by talking and thinking about killing himself.  Reiss said that he never acted on these thoughts because he believed in God and he wanted to be in heaven with his father.  Reiss testified that he also walked when he was angry.  He said he walked for probably an hour to calm down.  R. 78-79, 86.  Reiss also testified that he sometimes yelled when he got angry.  He said he got headaches when he yelled.  R. 89.

Reiss said he also got distracted easily.  He said that he "would do one thing, then stop and do another and forget to do it, finish it."  R. 89.

Reiss said he usually got up at 10:00 a.m.  He drank coffee and watched movies.  He walked to his grandmother's every day except Tuesdays.   He said he watched wrestling with his uncle.  He said he walked home after wrestling, took a shower and went to bed.  R. 79-80.

Reiss testified that he normally went to sleep between 10:00 and 11:00 p.m., and slept through the night.  R. 85.

Reiss said he also used to play video games, but stopped because of stiffness in his hands.  He said he last played a year and a half before the hearing.  R. 82.  Reiss said he also listened to music.  Reiss said that he had friends who visited him sometimes.  He watched television with them. Reiss said he used to go to church regularly.  R. 84.  He told the minister that he thought about killing himself, but did not do so because he wanted to go to heaven.  The minister told him that once he was saved, he was always saved.  R. 84.  After that conversation, Reiss quit going to church, "Well, I quit going to church because he pretty much said, yeah, it was okay to kill myself, I'd still be in heaven.  And it ain't that way.  You kill yourself, you go to hell."  R. 86.

Scribner then testified.  She said she saw Reiss weekly.  Reiss asked her about the statement in the CDI Unit report that Reiss' family did not work.  Scribner testified that she and her children all worked.  She said that Reiss' mother worked and his brother worked.  R. 94.

Scribner said that Reiss had problems in school.  He had learning disabilities.  She said, "He cannot remember things.  Jeremy has to have every day start the same.  If you throw something in different, it confuses

him." She said Reiss was still the same. R. 94. She said he had a hard time reading and writing. She said he also lost focus and concentration. She said he had a hard time focusing to complete the paperwork for the disability claim. He also would stop in the middle of simple chores, like taking out the trash, and not complete them. R. 94-95.

Scribner said the Reiss had "a lot of anger issues." She said,

Tell him no could set him off. Him wanting five dollars to go, you know, the gas station, get a soda or something, if say his mom don't have it or whoever doesn't have it, he gets angry and upset with you and why don't you have it. He seems not to understand that when you try to explain something to him, you have to do it in very simple terms.

R. 95. She said that when Reiss became angry, "He rant and raves, cusses. If he is sitting by the wall, he might bang his head into the wall. He might hit the wall. I mean he just -- or he might just clear the whole table of whatever is on it." Scribner said that Reiss was getting better since he started going to the Mental Health Association. R. 96. She said, though, Reiss needed very simple instructions,

You've got to work real slow with Jeremy and you have to be able to explain it in very simple terms. You can't do a broad term. Like go clean the kitchen, you can't say that. Jeremy, can you go in there and wipe the counters for me? Oh, okay. Jeremy, can you wash these dishes? Okay. You know, you can't just say go clean the kitchen because he doesn't know what you're wanting him to do.

R. 96.

Vocational expert Dr. Lanier then testified. The ALJ asked the

following hypothetical question:

> Q I would like to pose a couple of hypothetical questions. Initially I would like you to assume that we do have an individual that is the same age that the claimant is. So this individual is currently 33 years of age. The individual has the same limited education that the claimant has and the same work history that the claimant has. Additionally, I'd like you to assume this individual is limited to lifting no more than 20 pounds occasionally and 10 pounds frequently. The individual can sit, stand, or walk after six hours each in an eight-hour workday. The individual should never climb ladders, ropes, or scaffolds and no more than occasionally climb ramps or stairs, no more than occasionally balance, stoop, kneel, crouch, or crawl. This individual should avoid concentrated exposure to extreme cold, which I'm going to define as less than 50 degree Fahrenheit, as well as extreme heat, which I'm going to define as more than 90 degrees Fahrenheit. Additionally, this individual should avoid concentrated exposure to irritants such as dust, fumes, odors, gases, and poor ventilation.
>
> The individual would have moderate limitations in concentration, persistence, or pace when attempting complex or detailed tasks. So the individual would be limited to jobs that do not require complex or detailed job processes, little in the way of change in the job process from day to day. Additionally, there should be no more than occasional decision-making or changes in a work setting, so every day when the individual goes to work they know what their work tasks are. The individual should have no interaction with the general public, no more than occasional interaction with coworkers or supervisors. Additionally, the job tasks should be performed independently, so there should be no tandem tasks involved with the job tasks. Given those limitations, would such an individual be able to return to any of the claimant's past work?

R. 99-100. Lanier opined that the person could not do Reiss' prior work,

but could work as: an addresser, with 1,000 such jobs in Illinois and

83,000 nationally; a document preparer with 1,300 such jobs in Illinois and 32,000 nationally; a call-out operator, with 500 such jobs in Illinois and 14,000 nationally; a collator operator, with 3,600 such jobs in Illinois and 51,000 nationally; a router, with 3,415 such jobs in Illinois and 74,463 nationally; and a routing clerk, with 1,700 such jobs in Illinois and 112,000 nationally. Lanier said the listed jobs were representative of the types of work the person could do. R. 100-01. Dr. Lanier further opined that the hypothetical person could perform the representative tasks even if the "job needed to consist of multiple self-evident tasks that can be easily resumed after a momentary distraction." R. 103. Dr. Lanier opined that a person in these representative jobs would have to able to perform the work with only minimal supervision. R. 103-04. Dr. Lanier's testimony concluded.

At the end of the hearing, the ALJ agreed to a request by Reiss for additional testing. The ALJ ordered additional intelligence testing for Reiss. R. 105.

POST HEARING EVIDENCE

On May 22, 2014, Dr. Trello administered intelligence testing of Reiss. Reiss scored 72 on verbal comprehension, 77 on perceptual reasoning, with a full-scale score of 73. Dr. Trello stated that the 73 put Reiss in the borderline range of functioning. Reiss memory score was 83

and his processing speed score was 81. Dr. Trello stated that the two latter

scores were in the low average range. Dr. Trello opined that the scores

were an accurate account of Reiss' intellectual functioning. R. 674. Dr.

Trello assessed Reiss with intermittent explosive disorder, residual

symptoms of ADHD, generalized anxiety disorder, and cannabis abuse. R.

674-75.

Dr. Trello noted in her conclusion that Reiss reported hearing voices:

Mr. Reiss reported he has difficulty sleeping at night. He
worries, he is restless often and he seemed somewhat anxious.
He reported he hears voices that tell him to do things. The
voices tell him to steal and to kill himself. He never tries to kill
himself. His dad's voice and Tupac, his favorite rapper's voice,
tell him not to do the bad things. He said he believes in ghosts
and believes the spirits are talking to him. He has no other
psychotic symptoms that are obvious, and it is impossible to
know if he actually is hearing voices. He does go to Christian
County Mental Health Center and sees his counselor at least
once a month. He said that is what keeps him from killing
himself, plus his belief that he would go to hell if he did so.

R. 675-76.

## THE DECISION OF THE ALJ

The ALJ issued her decision on July 16, 2014. The ALJ followed the

five-step analysis set forth in Social Security Administration Regulations

(Analysis). 20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the

claimant not be currently engaged in substantial gainful activity. 20 C.F.R.

§§ 404.1520(b), 416.920(b). If true, Step 2 requires the claimant to have a

severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3

requires a determination of whether the claimant is so severely impaired

that he is disabled regardless of his age, education and work experience.

20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3,

the claimant's condition must meet or be equal to the criteria of one of the

impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1

(Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so

severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work

considering his age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to his prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden on the last step; the Commissioner must

show that, considering the listed factors, the claimant can perform some

type of gainful employment that exists in the national economy.  20 C.F.R.

§§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th

Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ determined that Reiss met his burden at Steps 1 and 2. The ALJ determined that Reiss had not engaged in substantial gainful activity since October 1, 2002, and he had the severe impairments of asthma, degenerative joint disease of the right knee status post-surgery; backache; hypertension; headaches; a learning disorder; intermittent explosive disorder; depression, anxiety, and a history of drug abuse. R. 12-13.

At Step 3, the ALJ determined that Reiss' condition did not meet or equal a Listing. The ALJ found that Reiss had mild restrictions on activities of daily living, moderate difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. R. 15. The ALJ found no episodes of decompensation. R. 16. The ALJ relied primarily on the Function Reports, the counseling records from the Mental Health Association, and the consultative reports from Drs. Vincent and Trello. R. 15-16.[2]

At Step 4, the ALJ found that Reiss had the following RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a reduced range of light work as defined in 20 CFR

---

[2] The ALJ applied the version of Listings 12.04 and 12.06 in effect at the time of the hearing. The Social Security Administration changed these Listings as of January 17, 2017. Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138, 2016 WL 5341732 (September 26, 2016).

404.1567(b) and 416.967(b). Specifically, he can lift/carry up to 20 pounds occasionally and 10 pounds frequently; and he can sit and stand/walk up to 6 hours total in an 8-hour workday; he can never climb ladders, ropes, or scaffolds; he can occasionally climb ramps/stairs; the claimant can balance, stoop, kneel, crouch, or crawl occasionally; he must avoid concentrated exposure to extreme cold, defined as less than 50 degrees Fahrenheit, extreme heat, defined as more than 90 degrees Fahrenheit, and respiratory irritants such as dusts, fumes, odors, gases, and poor ventilation. He is restricted to tasks that can be learned within 30 days that are routine and repetitive in nature; low stress work, defined as work with no more than occasional decision making or changes in work setting; no more than occasional contact with coworkers or supervisors and no contact with the general public; and tasks that are performed independently, with no tandem tasks.

R. 16-17.  The ALJ addressed Reiss' mental impairments by including the restrictions limiting Reiss to routine, low stress work with no more than occasional decision making; minimal contact with supervisors and coworkers and no contact with the public; and work performed alone.  The ALJ noted that Reiss did not seek mental health treatment, other than drug treatment, until September 2012.  The ALJ found that the Mental Health Association records are consistent with the RFC.  The ALJ relied on the intelligence test scores that showed an overall score of 73 which the ALJ characterized as a borderline score.  The ALJ stated that a person's intellectual and mental impairments generally remain stable upon reaching adulthood.  The ALJ noted that upon reaching adulthood, Reiss was able to perform routine work for three years at Pizza Hut from 2001 to 2004.  R.

507.  Reiss told Paso that he had to work three years as a condition of parole. The ALJ observed that Reiss stopped working once he was not required to do so by his parole.  The ALJ found that this evidence showed that Reiss had the ability to work at the level described in the RFC with his borderline intellect score.  R. 20-21.

The ALJ noted Dr. Trello's opinions that Reiss had mild limitations in carrying out simple instructions and making simple work-related decisions. The ALJ found this consistent with routine and repetitive tasks learned within 30 days.  The ALJ discounted evidence about hearing voices.  The ALJ noted that Reiss said once it was his conscience talking to him, and Dr. Trello said Reiss had no other obvious psychotic symptoms and it was impossible to know if he actually heard voices.  R. 20-22.

The ALJ relied on Reiss' ability to complete the intelligence test as evidence that he had the ability to concentrate at a level consistent with the RFC.  R. 22.

 The ALJ discounted Dr. Trello's opinions that Reiss was severely impaired in vocational areas as inconsistent with the other evidence.  R. 21-22.  The ALJ found that Dr. Trello's opinion was based on Reiss' subjective reports rather than objective clinical evidence.  R. 22.

The ALJ relied on evidence regarding Reiss' ability to interact with others to support the RFC. The ALJ noted that Reiss was able to get along with friends and family. The ALJ relied on the Mental Health Association's January 25, 2013 and July 30, 2013 assessments which indicated that Reiss had very mild functional impairments in the areas of behavioral norms, controlling violent, aggressive, or nuisance behaviors and respecting others. R. 629, 654. The ALJ also relied on the fact that Reiss was polite and cooperative with various health care professionals at the Mental Health Association. R. 22-23.

The ALJ gave limited consideration to the GAF scores by the various mental health professionals:

> The claimant's mental health providers have not provided any specific function-by-function assessments, but they did assess the claimant with Global Assessment of Functioning (GAF) scores, which were considered but given limited weight. GAF scores are of limited evidentiary value, as they reveal only snapshots of functioning and are generally not accompanied by specific explanations of the evidence supporting the assessment or of the particular limitations involved. Throughout the claimant's treatment at Christian County Mental Health Association, he was assessed with GAF scores ranging from 50 to 60.
>
> The most frequent score assigned was 60. These scores fall within, or just one point below, the range used for an individual with moderate symptomatology or moderate limitation in school, social, or occupational functioning. Although limited weight was given to these assessments, the undersigned notes that

moderate limitation is consistent with the restrictions set forth
above.

R. 24-25 (internal citations to the record omitted).

At Step 4, the ALJ found Reiss had no past relevant work.  R. 26.
The ALJ then went on to Step 5.  At Step 5, the ALJ found that Reiss could
perform a significant number of jobs in the national economy.  The ALJ
relied on the RFC finding; the Medical-Vocational Guidelines, 20 C.F.R.
Part 404, Subpart P, Appendix 2; and the opinions of vocational expert Dr.
Lanier that a person with Reiss' age, education, experience, and RFC
could perform jobs such as addresser, document preparer, and call out
operator.  R. 26-27.   The ALJ concluded that Reiss was not disabled.

Reiss appealed the decision of the ALJ.  On December 7, 2015, the
Appeals Council denied Reiss' request for review.  The ALJ's decision then
became the final decision of the Commissioner.  R. 1.  Reiss then brought
this action pro se for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine
whether it is supported by substantial evidence.  Substantial evidence is
"such relevant evidence as a reasonable mind might accept as adequate"
to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).
This Court must accept the findings if they are supported by substantial

evidence, and may not substitute its judgment or reweigh the evidence. Jens v. Barnhart, 347 F.3d 209, 212 (7ᵗʰ Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7ᵗʰ Cir. 1986). This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record. See Pepper v. Colvin, 712 F.3d 351, 367 (7ᵗʰ Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7ᵗʰ Cir. 2008); SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms). The ALJ must articulate at least minimally her analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7ᵗʰ Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7ᵗʰ Cir. 2000).

On appeal, Reiss argues that the ALJ erred because his mental condition and limited intellect render him disabled. The ALJ's decision regarding Reiss' functional impairments due to his mental impairments, including his learning disorder, are supported by substantial evidence.

The ALJ found that at Step 3 Reiss did not meet the relevant Listings for mental impairments, Listings 12.02, 12.04, 12.06, and 12.09. The ALJ

used the version of the Listings in effect at the time she issued her

decision.  These Listings were revised effective January 17, 2017.  Revised

Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138, 2016

WL 5341732 (September 26, 2016).  The revisions only clarified the

existing rules without making a substantive change.  The revisions apply

retroactively to claims such as this one because it was pending on the

effective date.  See Anderson v. Commissioner of Social Security, 2017 WL

1115157, at *11 (C.D. Ill. March 24, 2017); 81 Fed. Reg. at 66138.[3]  The

decision at Step 3 is supported by substantial evidence under either

version of the Listings.  The decisions at Steps 4 and 5 are also supported

by substantial evidence.

　　　The ALJ relied on several factors in assessing the effect of Reiss'

mental impairments.  The Mental Health Association assessed Reiss with

mild retardation.  The GAF assessments ranged from 50 to 60.  GAF

scores from 51 to 60 indicate moderate symptoms or moderate functional

limitations.  DSM-IV-TR, at 34.  The ALJ did not put great weight on GAF

scores, but found they were consistent with her analysis of the remainder of

---

[3] The revised listings require that (A) the disorder included five of the listed symptoms such as sleep
disturbance, difficulty concentrating, or suicidal thoughts; and the disorder resulted in either: (B) extreme
limitations in one or marked limitations in two of the following areas of mental functioning: (i) understand,
remember and apply information; (ii) interact with others; (iii) concentrate, persist, or maintain pace; and
(ii) adapt or manage oneself; or (C) the disorder is serious and persistent, meaning the disorder has
lasted at least two years and has evidence of (1) medical treatment, mental health therapy, psychosocial
supports or a highly structured setting that diminishes symptoms; and (2) minimal capacity to adapt to
changes in environment and demands of daily life.  See Listing 12.00 .1. a-c.

the evidence.  Reiss stated that his hearing voices was more like listening to his conscience.  Dr. Trello said Reiss did not have any other psychotic symptoms and it was impossible to know if he actually heard voices.  Finally, Reiss demonstrated the intellectual functional capacity to work at jobs within his RFC when he worked for three years as a prep cook from 2001 to 2004.  This evidence is sufficient to support the ALJ's decision.

Reiss cites his school records and the February 2013 Mental Health Association assessment to support his argument.  The school records show very low academic ability.  Reiss struggled in special education classes.  He dropped out and returned after completing juvenile detention.  He dropped out again in the tenth grade.  The issue, however, is not academic or intellectual ability.  The issue is functional ability to work.  A person with a limited intellect and other mental impairments may or may not be able to work depending on the circumstances.  The fact that Reiss worked from 2001 to 2004 at a Pizza Hut performing routine repetitive tasks as a prep cook supports the ALJ's findings that Reiss had the mental functional capacity to perform the types of work described in the ALJ's RFC.  The Mental Health Association February 2013 assessment characterized Reiss as having mild retardation and a high GAF score of 60 in prior year.  A GAF score of 60 indicates moderate symptoms or

moderate functional limitations.  That assessment is also consistent with the ALJ's RFC determination and overall decision.  The evidence cited by Reiss does not contradict the ALJ's decision and does not show that the decision was not supported by substantial evidence.

THEREFORE, THIS COURT RECOMMENDS that the Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 17) be ALLOWED, Reiss' Motion for Summary Judgment (d/e 14) be DENIED, and the decision of the Commissioner be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   August 22, 2017

_/s Tom Schanzle-Haskins_
UNITED STATES MAGISTRATE JUDGE